# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

BILLY FRANKLIN JOHNSON, III,      )
                                  )
    Petitioner,              )      NO.  3:06-0416
                                  )      JUDGE HAYNES
                                  )
                                  )
CHERRY LINDAMOOD, Warden,         )
                                  )
    Respondent.              )

## M E M O R A N D U M

Petitioner, Billy Franklin Johnson, III, filed this pro se action under 28 U.S.C. § 2254,

seeking to set aside his convictions for first degree murder, felony murder and theft  for which he

received a life sentence.  After a review of the petition, the Court appointed the Federal Public

Defender to represent the Petitioner and an amended petition was filed.  Petitioner's specific

claims are that: (1) his trial counsel provided ineffective assistance for failures to obtain a second

competency evaluation and to pursue an insanity and/or diminished capacity defense; (2)

Petitioner was incompetent to stand trial; (3) Petitioner's confession was coerced and the trial

count's denial of his motion to suppress his confession was an unreasonable application of

federal law; and (4) the state's evidence was insufficient to support his convictions.  (Docket

Entry No. 6, Amended Petition at 3-4).

### A.  Procedural History

On July 12, 2000, a jury convicted Petitioner of first degree murder, felony murder and

theft and was sentenced to an effective term of life in prison.  On appeal, the Tennessee Court of

Criminal Appeals affirmed his conviction and sentence.  State v. Johnson, No. M2001-00330-

CCA-R3-CD, 2003 WL 358251 (Tenn. Crim. App. Feb. 18, 2003).  On September 2, 2003, the

Tennessee Supreme Court denied his application for permission to appeal. Id. Petitioner did not seek the writ of certiorari in the United States Supreme Court.

On March 14, 2006, the Petitioner filed his current petition. (Docket Entry No. 1). In earlier proceedings in this action, this Court conducted an evidentiary hearing on the Respondent's motion to dismiss the petition as untimely and the Petitioner's assertion of equitable tolling. The Court found sufficient grounds for equitable tolling and ordered the Respondent to file a response to the petition within twenty (20) days. (Docket Entry No. 38).

Before the Court is the Respondent's motion to dismiss (Docket Entry No. 41) that is supported by his brief and the state record. (Docket Entry Nos. 42 and 43). Petitioner has filed responses. (Docket Entry Nos. 45 and 53). Based upon the Court's review of the state record and the parties' motion papers, the Court set an evidentiary hearing on whether Petitioner could establish cause and prejudice for his procedural defaults, citing Deitz v. Money, 39 . F.3d 804, 809 (6th Cir. 2004). (Docket Entry No. 54).

### B. Review of the State Record

### 1. Findings of Fact

The facts[1] underlying the Petitioner's convictions are set forth by the Tennessee Court of Criminal Appeals as follows:

> This case relates to the defendant's killing Billy Wiggins with a sledgehammer. Tom Hailey testified that he and the victim were friends and that he had known the victim for a couple of years. The victim drove a tour bus for country music bands and would leave Nashville on trips that lasted two days to two months. While the victim was away, Mr. Hailey checked on the victim's house and picked

_____

[1]State appellate court opinion findings can constitute factual findings in a habeas action, Sumner v. Mata, 449 U.S. 539, 546-47 (1981), and have a statutory presumption of correctness 28 U.S.C. § 2254(d).

2

up his mail. Mr. Hailey had a key to the victim's home and would put the mail on the victim's dining room table.

In January 1998, the victim had been away from home on a bus trip. The victim was a few days late returning to Nashville, and Mr. Hailey tried to contact the victim through the victim's pager and cellular telephone. When the victim did not answer, Mr. Hailey went to the victim's home and noticed that the victim's 1985 Mercury Marquis was gone. He went into the house, opened the victim's bedroom door, and saw the victim lying in bed. Mr. Hailey knew the victim was dead, closed the bedroom door, called 9-1-1, and went outside to wait for the police. On cross-examination, Mr. Hailey testified that he lived twelve to fifteen miles from the victim. He said he did not remember telling the police that the victim liked to pick up young men and take them to the victim's home in order for the men to do odd jobs. He also said he did not remember telling the police that the victim was a homosexual. He said that as soon as the victim would get back from a bus trip, the victim would pick up men who did not have a place to live and would hire them to clean his bus. He said the victim paid the men, allowed them to spend the night in the victim's home, and cooked supper for them. He said he had seen the victim with the defendant and the codefendant, David Lackey, before. He said that one time he visited the victim's home while the defendant and Mr. Lackey were there and that the victim cooked dinner for the defendant and Mr. Lackey.

Mr. Hailey testified that the victim did not drink but that men who stayed at the victim's house would bring their own beer. He said that he never saw the victim give the men gifts and that the victim did not help the men find jobs. He said that the victim took prescription medicine and that he did not remember seeing drugs or alcohol in the victim's home. He said that on the day he found the victim, he was in the victim's home for about five to ten minutes and touched three doorknobs and a telephone.

Lieutenant John Stephens of the Nashville Metropolitan Police Department (Metro Police) testified that at 6:15 p.m. on January 24, 1998, he was dispatched to the victim's home at 716 Greymont Drive. Another officer told him that a body was inside, and he and the officer entered the victim's bedroom. The victim was lying in bed, and most of the victim's body was covered with a blanket. A tool handle was sticking out from underneath the covers at the head of the bed, and Lieutenant Stephens later learned the tool was a sledgehammer. He and the officer went outside and secured the house until homicide detectives arrived.

Dr. John E. Gerber, a forensic pathologist, testified that the fifty-year-old victim died of multiple blunt force injuries to the right side of his head. The injuries fractured the victim's skull and tore his brain. The victim also had bruises on his

3

right elbow and on his right forearm. No drugs or alcohol were found in the victim's blood, and the body was moderately decomposed. The victim may have lived for an hour after he was attacked and could have made sounds during that time. Although Dr. Gerber did not know how the victim injured his right arm, he said that the bruises on the victim's forearm and elbow could have been defensive wounds.

Metro Police Officer Edward Shea testified that he worked in the Identification Section of the department and that on January 24, 1998, he was called to 715 Greymont Drive to photograph the crime scene and collect fingerprint evidence. He found blood spatter on the victim's bedroom door and on the wall at the head of the victim's bed. He also saw that the victim's bed sheets and pillows were heavily stained with blood. An entertainment center in the victim's bedroom had been pulled away from the wall, and a television was missing. The handle of a sledgehammer was sticking out from underneath the sheets at the head of the victim's bed, and Officer Shea collected the sledgehammer as evidence.

Larita Marsh, a fingerprint analyst for the Metro Police, testified that she analyzed fingerprint evidence from the victim's home. She said that fingerprints found on the inside of a bathroom door and on the right side of the victim's entertainment center matched the defendant and that fingerprints found on a plastic container in the victim's living room and on the outside of the victim's bedroom door matched David Lackey. She said that other fingerprints found in the home matched the victim and that one fingerprint matched a man named John Matthew Cleg.

Metro Police Officer Ralph Deavers testified that in January 1998, he worked in the police department's Identification Section and received a sledgehammer for processing. He said he put a chemical dye on the sledgehammer and was able to see smudges and smears on its handle. He acknowledged that the smudges and smears could have been caused by someone wearing gloves.

Metro Police Officer Gary Felts testified that on January 22, 1998, two days before Tom Hailey found the victim, he was dispatched to an accident at the intersection of Eighteenth and West End Avenues. He saw that the front of a Mercury Marquis had hit a utility pole. Although the driver was not present, Officer Felts learned from the car's license tag and registration that it belonged to the victim. He had the car towed to the police department.

Metro Police Detective Larry Carter testified that at 8:30 a.m. on January 22, he reported to a traffic accident at Eighteenth and West End Avenues. He had been called to the scene because another officer had found electronic equipment in the car. After the car was towed to the police department, Detective Carter inventoried the car and made a list of the items he found. The list, which the state

4

introduced into evidence, shows that the car contained eighteen items, including several televisions and video cassette recorders (VCRs). Detective Carter learned that the car belonged to the victim and that the car had not been reported stolen. On January 23, he went to the victim's house in order to get information about the car and the electronic equipment. Mail was in the victim's mailbox, the blinds in the victim's house were closed, and the house looked abandoned. Detective Carter knocked on the victim's door and radioed for assistance. He talked to the victim's neighbors but did not find the victim. Two days later, he found out that the victim had been killed. On cross-examination, he said that the windshield on the Marquis had been cracked and that hair and tissue were embedded in the broken glass.

Metro Police Officer Charles Ray Blackwood, Jr. testified that on February 2, 1998, he helped another officer collect evidence, including a glove, a wallet, and a driver's license, off Interstate 24 in Davidson County. Officers found the items in the grass beside the shoulder of the interstate, and the distance between the first and last pieces of evidence was one thousand feet. The evidence was tested for fingerprints, but no prints were recovered. On cross-examination, Officer Blackwood said that the glove appeared to have been thrown from the interstate. The glove was dirty but no blood, hair, or fibers were on it. Officer Blackwood did not remember how far the glove was found from the other items and did not know if the glove had anything to do with the victim's death.

Detective Keith Barnett of the Montgomery, Alabama Police Department testified that Montgomery police officers arrested the defendant at 2:20 a.m. on February 7, 1998, based on a warrant that had been issued for the defendant in Nashville. He said that ten minutes after the police arrested the defendant, officers brought the defendant to the police station and he began talking to the defendant. He said that at first, the defendant could not remember anything and could not tell Detective Barnett the defendant's name. He said that he had received a picture of the defendant from the National Crime Information Center (NCIC) and that he showed the picture to the defendant. He said that he told the defendant he knew who the defendant was and that he filled out a waiver of rights form for the defendant. He said that he explained the form to the defendant and that the defendant wanted to talk to him. He said the defendant signed the form and admitted his name was Billy Johnson.

Detective Barnett testified that the defendant was scared and nervous but very polite. He said the defendant told him the following: The defendant had been in Nashville and had been staying with the victim in the victim's house. The victim would pick up young men and let them live with him in exchange for sex. David Lackey also had been staying at the victim's home. Although Mr. Lackey had had sex with the victim, the defendant had not. The defendant was homeless and frustrated that he did not have any money. He wanted to get back on his feet and

5

decided to kill the victim and pawn the victim's property. The defendant told Mr. Lackey that he was going to kill the victim and got a sledgehammer out of the victim's garage. While the victim slept, the defendant went into the victim's bedroom and hit the victim three times with the sledgehammer. The defendant and Mr. Lackey loaded the victim's property into the victim's Marquis and drove downtown to pawn the property. On the way to a pawn shop, the car hydroplaned and hit a utility pole. The defendant and Mr. Lackey ran from the accident and split up. The defendant spent a couple of more nights in Nashville and then hopped a freight train to Montgomery, Alabama. The state played a videotape of the victim's statement for the jury, and the tape corroborated Detective Barnett's testimony.

On cross-examination, Detective Barnett testified that the defendant was dirty but did not appear to be intoxicated. He acknowledged that the defendant told him the defendant took pills and drank alcohol while the defendant was staying with the victim. He said the defendant told him that the victim had been pressuring the defendant for sex and had threatened to put the defendant back on the street. The defendant told Detective Barnett that he "snapped" and that he did not know where he had been for the last couple of days because he had been taking drugs. He said the defendant claimed that he did not plan to kill the victim.

Metro Police Detective Roy Dunaway testified that he was the lead investigator in the case. He said that the victim's entertainment cabinet had been pulled away from the wall in order for someone to unplug the victim's electronics and that an outline of dust in the cabinet indicated a television and a VCR were missing. He said that a blanket and a pillow were on the victim's living room couch and that when he moved the blanket, a knife fell on the floor. He said that during his investigation, he went to an area off Interstate 24 near Briley Parkway and found some of the victim's identification. He said he developed the defendant and David Lackey as suspects and faxed a warrant and a photograph of the defendant to police in Montgomery, Alabama.

Detective Dunaway testified that Montgomery police arrested the defendant and that he drove the defendant from Montgomery to Nashville on February 12, 1998. He said he took the defendant to the Criminal Justice Center, advised the defendant of his rights, and read a waiver of rights form to him line by line. He said the defendant appeared to understand his rights and signed the form. He said that he interviewed the defendant and that the interview was audiotaped. The defendant's audiotaped confession, which was played for the jury, is nearly identical to his videotaped confession.

On cross-examination, Detective Dunaway testified that he talked to Tom Hailey and that Mr. Hailey claimed to have been the victim's best friend. He

6

acknowledged that Mr. Hailey told him that the victim was a homosexual, that the victim liked to pick up young men, and that the men helped the victim clear his buses. He said that during his investigation, he saw empty beer cans and liquor bottles in the victim's living room and trash can. He said that the defendant had been in custody in Alabama for seven days when he first spoke to the defendant and that the defendant appeared sober. He said that as soon as he and the defendant got back to Nashville, he began questioning the defendant. He said the defendant told him that the defendant had been taking a lot of pills and drinking beer and Jack Daniels the night he killed the victim. He said the defendant told him that the victim had been trying to get sex from the defendant and that the defendant's head had been ringing and screaming. He acknowledged that the defendant told him that after the defendant killed the victim, the defendant drank beer in order to calm down and blacked out. He said that although the defendant could not remember some details of the killing, he thought the defendant had been truthful with him. The jury convicted the defendant of first degree premeditated and felony murder and theft of property valued more than five hundred dollars but less than one thousand dollars.

State v. Johnson, 2003 WL 358251 at *1-3.

## 2. Review of the Federal Habeas Record

After the first evidentiary hearing, the Court found that given his mental limitations, Petitioner was limited in his pursuit of his legal options during the relevant time period and therefore determined that there were adequate grounds for tolling the federal statute of limitations on Petitioner's habeas claims. (Docket Entry No. 38).

Petitioner's earlier proof was an evaluation by Dr. Fred. A. Steinberg, a clinical psychologist who examined Petitioner's history and noted that since he was 16, Petitioner had a long history of drug and alcohol abuse, including cocaine. (Docket Entry Nos. 12-1 and 12-2). Petitioner drank a bottle of whiskey or a case of beer each day, and sometimes both. (Docket Entry No. 12-2, January 15, 1998 Report of Middle Tennessee Mental Health Institute at 31). A year before the offenses at issue, Petitioner was hospitalized for eight months for substance abuse, id., and during the two year period of the offenses, Petitioner was also treated for

7

depression. Six months prior to the offenses, Petitioner was hospitalized at Vanderbilt Hospital after an overdose of cocaine. Id. at 2.

On January 2, 1998, Petitioner was admitted to Ozarks Medical Center in West Plains, Missouri, citing pressure or vibrations inside his head, seeing things in the room rush at him and past him, and hearing rings in his ears, despite refraining from drugs for at least three weeks or alcohol for a week. Id. Dr. James Ireland noted that: "I wonder a little about this gentleman being a little psychotic," id., but upon his discharge, on January 5, 1998, the diagnosis was: (1) Cephalgia or pressure in the head, not necessarily a headache; (2) Polysubstance abuse; and (3) Upper respiratory infection, mild. Id. at 6. Upon his discharge, Petitioner was prescribed Prednisone, Vancenase and Elavil. Id.

Five days later, Petitioner was admitted to the Middle Tennessee Mental Health Institute ("MTMHI") for an "attempted suicide via OD of antidepressants, cocaine and benzodiazepines." Id. at Exhibit A, "Referral for Alternative Follow-up Services" report. MTMHI diagnosed Petitioner with "Major Depressive Episode, Recurrent Moderate," "Substance Induced Mood Disorder," and "History of Anxiety Disorder." Id. at 1. The report cited Petitioner's "suicidal ideation." Id. at 4. After a five day stay and a prescription of Paxil, Petitioner was released on January 14, 1998. Id. at 4-5.

At his trial, Petitioner testified that after his release, Petitioner met Billy Wiggins and stayed at Wiggins' home, but Wiggins pressured him for sex. (Docket Entry No. 45-3, at 86, 108).[2] On the night of January 20, 1998, Petitioner had been drinking whiskey and beer and had

---

[2]For clarity and consistency, the citations to the appropriate docket entries are the pagination of that entry by the Court's electronic filing system.

8

taken "a bunch of pills" of unknown type provided by Wiggins. Id. at 84, 86, 107. After this consumption, Petitioner asserts that he "snapped," with screeching and screaming inside his head. Id. at 86, 108. Yet, the proof at Petitioner's trial was that Petitioner told Lackey that he would kill Wiggins and pawn some of his property for money. Id. at 77. Petitioner entered Wiggins' bedroom and hit him with a sledgehammer as Wiggins was asleep in his bed, killing him. Id. at 77. Petitioner and Lackey then took some of Wiggins' property and car and left Wiggins' home to pawn the equipment. Id. Their vehicle, however, crashed and Petitioner and Lackey fled. Id.

 The Court set an evidentiary hearing on the issue of whether Petitioner could establish cause and prejudice for his procedural defaults. At that hearing Petitioner presented two witness: Pamela Ogle Blair, his trial counsel, and Dr. Steinberg, the clinical psychologist who submitted the earlier evaluation cited supra at pp. 7-8.

 As to Blair, Petitioner offered a series of medical reports from different agencies that had treated Petitioner for various illnesses after the competency evaluation ordered by the trial court. Petitioner Collective Exhibits No. 2 and 14. Blair acquired these reports after the September 23, 1998 evaluation by the Vanderbilt Psychiatric Clinic that found Petitioner to be competent and not to have been suffering from any mental impairment at the time of the murder. Plaintiff's Collective Exhibit No. 2. Blair acquired these reports for sentencing issues and did not request another competency evaluation in light of these reports. In addition, Petitioner presented his jail medical records (Petitioner's Collective Exhibit 14B) that Blair did not acquire. Petitioner cites these jail records reflecting his mental condition. Blair testified that after the Vanderbilt evaluation, she did not observe Petitioner to manifest any mental problems except for the one

occasion when Petitioner stated that he would no longer assist her as he was leaving all the criminal matters in God's hands. Petitioner Exhibit No. 13. Petitioner, however, did not identify any other factual matters about the murder charges that Blair failed to discover or present for the Petitioner.

At the evidentiary hearing, Dr. Steinberg testified about Petitioner's medical records that he claimed provided evidence of the Petitioner's psychosis. Dr. Steinberg cited the jail records showed a prescription of Loxitane, a psychotic medication and have repeated references to Petitioner's statements about his demons as well as ringing and screams inside his head. Petitioner Exhibit 14 at 16, 42-43. All of these statements before the Vanderbilt Psychology Clinic's September 23, 1998 evaluation. Id. at 17-20, 23, 31, 32.

At the time of his confinement in the jail, Petitioner took the medication Paxil for anxiety, as well as sleeping aids. Id. at 9. The diagnosis of psychiatrists who observed Petitioner in the jail were "polysubstance abuse, psychosis NOS vs facticious d/o, disasociative d/o and [post traumatic stress disorder] mild delayed." Id. at 21. At another psychiatric evaluation on August 18, 1998, the diagnoses were "Major Depressive Disorder recurrent moderate; substance induced mood disorder, history of anxiety disorder, alcohol and cocaine dependence, and marijuana abuse." Id. at 36. During this evaluation, Petitioner exhibited "good insight and judgment." Id. at 38. At other times, the licensed social worker found Petitioner to be "alert and oriented x 3" or "4" and "mildly depressed." Id. at 14, 21, 32 and 46. In March 1999, Petitioner was noted as "doing okay" except for sleeping and bad dreams. Id. at 46.

Dr. Steinberg also cited Petitioner's additional medical records that Vanderbilt Clinic acquired after its September 1998 competency evaluation as warranting another competency

10

evaluation. Yet, Dr. Steinberg conceded that none of the additional medical evaluations diagnosed Petitioner as having any psychotic condition. Petitioner's Collective Exhibit 2 at 40, 56, 61, 70, 87, 106. The 1995 evaluation for juvenile court found "no evidence of psychopathology." Id. at 41. The Taft Youth records reflect only history of substance and alcohol abuse. Id. at 48. Petitioner's 1997 discharges notes from the emergency room treatment at the Vanderbilt University Medical Center reflect "pt. verbalized understanding, discharged in stable ambulatory condition." Id. at 105. The January 1998 evaluation reported Petitioner as "functioning pretty well." Id. at 99. Dr. Steinberg's testimony was that the jail and other medical records reflected that Petitioner's statement suggested that he "could" or "possibly be" psychotic. Dr. Steinberg cited medical records reflecting a possible psychotic condition that was an initial observation of the admitting physician. The final diagnosis did not find that Petitioner had any psychosis. Petitioner's jail medical records do reflect that the treating psychiatrist prescribed Loxitane that is for psychosis. The same diagnosis was that Petitioner may be exhibiting a "factitious disorder" that Dr. Steinberg explained that the psychiatrist was "weighing whether [Petitioner is] concocting any kind of symptoms." Dr. Steinberg also considered Petitioner's psychosis to be transient. The Court notes that Dr. Steinberg's initial evaluation of Petitioner was: "Axis I Polysubstance Abuse; Axis II, Borderline Personality Disorder; and Axis IV: Problems with primary support group." (Docket Entry No. 12-2 at 9).

Finally, the Vanderbilt Clinic's evaluation reflects that those treating psychiatrists were aware that Petitioner had been prescribed Loxitane at the time that the clinic's psychiatrist deemed Petitioner competent to stand trial and lacking any significant mental impairment at the time of the murder. Petitioner did not testify at the hearing, but the Respondent introduced the

11

videotape of his confession in which Petitioner was lucid and did not exhibit any mental impairment. Petitioner has a performance IQ of 124. (Petitioner Exhibit No. 2 at 40).

## C. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings, as opposed to dicta" of its decisions "as of the time of the relevant state-court decision." Id. at 412. In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law."

12

Under the "unreasonable application" clause, a state court judgment results in an

"unreasonable application" of clearly established federal law "if the state court identifies the

correct governing legal rule from [the Supreme] Court's decision but unreasonably applies that

principle to the facts of the prisoner's case." Id. The Supreme Court explained that a state

court's application of clearly established federal law must be "objectively unreasonable," and a

federal habeas court may not grant habeas relief "simply because that court concludes in its

independent judgment that the relevant decision applied clearly established federal law

erroneously or incorrectly. Rather, that application must also be unreasonable." Id at 411. A

state court's application of federal law is unreasonable and habeas relief may be granted if the

"state court decision is so clearly incorrect that it would not be debatable among reasonable

jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v Johnson, 97

F.3d 751, 769 (5th Cir. 1996)).

In reaching this decision, the Supreme Court reiterated that the claims were to be decided

on the record before the state court:

> In this and related contexts we have made clear that whether a state court's
> decision was unreasonable must be assessed in light of the record the court had
> before it. See Yarborough v. Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1
> (2003) (per curiam) 124 S.Ct., at 4 (denying relief where state court's application
> of federal law was "supported by the record"); Miller-El v. Cockrell, 537 U.S.
> 322, 348, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (reasonableness of state court's
> factual finding assessed "in light of the record before the court"); cf. Bell v. Cone,
> 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to
> consider evidence not presented to state court in determining whether its decision
> was contrary to federal law).

Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added). The district court also "must

presume that all determinations of factual issues made by the state court are correct unless the

13

Defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 738 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes credibility findings of the state courts. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

### 1. Exhausted Claims

On his direct appeal, Petitioner's claims were: (1) that the trial court erred in failing to suppress his statements; (2) the trial court erred in refusing to direct the State's attorney to refrain from misstating the facts in her closing argument; (3) prosecutorial misconduct during closing argument in the prosecutor's misstating the facts and Petitioner's words to the jury; and (4) insufficient evidence to support his convictions. Johnson, 2003 WL 358251 at *1.

### a. Miranda Claims

For these claims, Petitioner asserts that his "conviction was based on a coerced confession" and that his signed waivers of his Miranda rights were involuntarily and unknowingly given. A related contention is that the state trial court erroneously denied his motion to suppress his statements to Alabama police after his arrest. In sum, Petitioner contends that at the time of his statements to the police, he was under the influence of alcohol and marijuana and was subjected to coercive and threatening statements of the police officer. Specifically, Petitioner asserts the police officer told him he would face the death penalty unless he confessed and with a confession his sentence would be probably twenty (20) years.

The Tennessee Court of Criminal Appeals reviewed the testimony given at the suppression hearing that addressed Petitioner's contentions and affirmed the trial court's denial of the Petitioner's motion to suppress:

> [T]he defendant contends that the trial court erred by denying his motion to

14

suppress his confessions to Montgomery and Nashville police. Regarding his confession to Montgomery police, he claims that it was given involuntarily because he had been without food and rest and because officers told him he would get the death penalty if he did not talk to them. He claims that the trial court also should have suppressed his confession to Nashville police as fruit of the poisonous tree resulting from his first involuntary confession. The state argues that the trial court properly denied the defendant's motion. We agree with the state.

At the suppression hearing, Detective Keith Barnett testified that Montgomery police officers arrested the defendant at 2:20 a.m. on February 7, 1998, and that he read the defendant his rights from a waiver of rights form at 2:35 a.m. He said that he asked the defendant if the defendant understood his rights and that the defendant said yes. He said that he had the defendant read aloud the following paragraph from the form:

> I fully understand the foregoing [rights] and do willingly agree to answer questions. I understand and know what I am doing. No promise or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone.

He said that the defendant signed the waiver of rights form and gave a statement. He said that he took the defendant into an interview room and that he and the defendant went over the waiver of rights form again. He said that the defendant gave a second statement and that the second statement was videotaped. He said that the defendant did not appear to be intoxicated or on drugs, that the defendant did not stagger, and that he did not smell alcohol on the defendant.

On cross-examination, Detective Barnett acknowledged that he did not videotape the defendant's first statement and that at first, the defendant claimed he did not know anything. He denied telling the defendant that the defendant would "f-y" if the defendant refused to give a statement and that the defendant probably would get a twenty-one-year sentence if he talked to the police. He said that another officer was present during the defendant's interviews and that he did not hear the officer make any threats or promises to the defendant. He said he did not remember asking the defendant if the defendant had been drinking but that the defendant appeared to be very coherent and did not look tired.

Detective Roy Dunaway testified that he and another officer drove the defendant back to Nashville on February 12. He said that when they arrived, he immediately went over a waiver of rights form with the defendant. He said that he read the defendant his rights from the form, that the defendant read the form along with him, and that the defendant initialed the rights. He said that the defendant signed

15

the form and did not appear to be intoxicated or on drugs. He acknowledged that the following question appears at the bottom of the form: "Did this subject appear intoxicated or have any known impairment that would render him or her incompetent to fully understand the rights above and make a knowing, intelligent, and voluntary waiver?" He acknowledged that he did not answer the question and said that he must have overlooked it. He said that after the defendant signed the waiver of rights form, he interviewed the defendant and that the interview was audiotaped.

On cross-examination, Detective Dunaway testified that during the trip from Montgomery to Nashville, he and the defendant made conversation. He said that they stopped somewhere for lunch and that the defendant did not appear tired. He said that he did not ask the defendant if the defendant had been taking drugs or drinking alcohol and that the defendant appeared completely normal.

The defendant testified that he had been living on the streets when Montgomery police officers arrested him and that he was tired and worn down. He said that at first, he told the Montgomery officers that he did not know who he was. He said the officers told him he was going to "F-ing fry" if he did not give a statement and that he could get a twenty-year sentence if he talked to them. He said that he did not know anything about the judicial process and that he confessed to killing the victim because he was scared and because the officers kept hounding him. He acknowledged that he had been in trouble with the law as a juvenile and that he had been charged as an adult for two misdemeanors. He also acknowledged that he was lying when he told Montgomery officers that he did not know his name.

The defendant testified that he was still scared and worn down when he confessed to Nashville police. He said, though, that he felt better during his interviews with the Nashville police officers than he had with the Montgomery police officers because he had slept in jail. On cross-examination, he acknowledged signing waiver of rights forms in Montgomery and Nashville. He also acknowledged that Detectives Barnett and Dunaway read the forms to him and that he understood the forms.

The trial court watched and listened to the defendant's confessions. It noted that during the defendant's confession to Montgomery police, he walked into the interview room without difficulty, sat down, and opened a soft drink. It noted that the defendant read the waiver of rights form aloud and that his speech was clear. Finally, the trial court pointed out that in the videotape, the defendant stood up without difficulty and demonstrated how he hit the victim with the sledgehammer. The trial court found "no evidence whatsoever that this gentleman was under any type of influence at the time he made this statement." It denied the defendant's motion to suppress his statements to Montgomery and Nashville police.

16

> Our review of the record supports the trial court's determination that the defendant voluntarily confessed to killing the victim. Detective Barnett testified that he read Miranda warnings to the defendant before the defendant's first interview in Montgomery and that the defendant signed a waiver of rights form. Detective Barnett further testified that the defendant was not under the influence of drugs or alcohol and that he did not make any threats or promises to the defendant. Similarly, Detective Dunaway testified that he read Miranda warnings to the defendant before the defendant's first Nashville interview and that the defendant signed a waiver of rights form. On both the Montgomery and Nashville forms, the defendant signed statements acknowledging that he had not been pressured or promised anything in return for his talking to the police, and he testified at the suppression hearing that he read the forms and understood them. We note that in our review of the defendant's video- and audiotaped confessions, the defendant was calm and extremely articulate in describing why and how he killed the victim. At no time did he indicate that he was confused or that the police pressured him into confessing. We conclude that the defendant voluntarily confessed to the crimes and that the trial court properly denied his motion to suppress.

State v. Johnson, 2003 WL 358251 at **7-9 (citing, inter alia, Stansbury v. California, 511 U.S. 318, 322 (1994) and Miranda, 384 U.S. at 444) (emphasis added).

Under the Fifth Amendment to the United States Constitution, a defendant in a criminal case cannot be compelled to be a witness against himself. In Miranda v. Arizona, 384 U.S. 436, 467-68 (1966), the Supreme Court held that "if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent." The Miranda rule is limited to 'custodial interrogations,' that the Supreme Court defined as "'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way.'" Oregon v. Mathiason, 429 U.S. 492, 494 (1977).

Under Miranda, a defendant may waive his constitutional right to remain silent and to consult with an attorney, provided the waiver is made voluntarily, knowingly, and intelligently. 382 U.S. at 444. See also Colorado v. Spring, 479 U.S. 564, 573 (1987). A suspect's waiver of

17

Miranda rights need not always be express and "in at least some cases can be clearly inferred from the actions and words of the person interrogated." North Carolina v. Butler, 441 U.S. 369, 373 (1979). Any waiver of Miranda rights must be proved by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168 (1986). Any statements based upon an involuntary waiver must be excluded. Pa v. Muniz, 496 U.S. 582, 589 (1990). Miranda also prohibits the admission of voluntary statements given after involuntary statements are made, Oregon v. Elstad, 470 U.S. 298, 309-10 (1985), or voluntary statements given after voluntary, but unwarned statements. Id. at 310. Relevant factors on this issue are intervening time, removal of the prisoner to a different place, and change in identity of interrogators. Id. In Elstad, the Court upheld the use of a subsequent confession with Miranda warnings, after a voluntary confession at the defendant's home without Miranda warnings. 470 U.S. at 310-11. "[C]oercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment." Connelly, 479 U.S. at 167. See also Clark v. Mitchell, 425 F.3d 270, 283 (6th Cir. 2005). Admission of an involuntary confession is subject to harmless error analysis. Arizona v. Fulminante, 499 U.S. 279 (1991).

"To determine whether the confession was knowing and intelligent, we apply a totality of the circumstances test to ascertain whether [the defendant] understood his right to remain silent and to await counsel. The inquiry is not whether 'a criminal suspect know[s] and understand[s] every possible consequence of a waiver of the Fifth Amendment Privilege.'" Clark, 425 F.3d at 283 (quoting Spring, 479 U.S. at 573). The court examines the "particular facts and circumstances of the case, 'including the background, experience and conduct of the accused.'" Machacek v. Hofbauer, 213 F.3d 947, 954 (6th Cir. 2000) (citation omitted). Only if the

18

"'totality of the circumstances surrounding the investigation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived." <u>Moran v. Burvine</u>, 475 U.S. 412, 421 (1986) (internal citations omitted).

For waiver purposes, the pivotal issue is who initiates further discussion after <u>Miranda</u> rights are invoked. If the police initiate the discussion, such discussion is constitutionally prohibited even if it concerns an entirely different criminal investigation, and even where the defendant executes a waiver and his statements would be considered voluntary under traditional standards. <u>Roberson</u>, 486 U.S. at 682-85; <u>Edwards</u>, 451 U.S. at 484-85. This is so because the Fifth Amendment <u>Miranda</u> rights are non-offense-specific, and is designed to protect the unaided laymen at critical confrontations with the prosecution after "'the adverse positions of government and defendant have solidified' with respect to a particular alleged crime." <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 177-178 (1991) (quoting <u>United States v. Gouveia</u>, 467 U.S. 180, 189 (1984)).

The state record establishes that Barnett, the Alabama detective, conducted two interviews of Petitioner: an unrecorded pre-interview and an video recorded interview. Petitioner contends that the state court record does not support the Tennessee appellate court's finding that Barnett read Petitioner his <u>Miranda</u> warnings and that Petitioner also signed his written waiver of his <u>Miranda</u> rights before Petitioner gave his incriminating statements. <u>Johnson</u>, 2003 WL 358251 at *9.

The state record reflects that Barnett was contacted at 2:20 a.m. about Petitioner being in custody as a suspect after Petitioner was seized at a van in a parking lot and Barnett read his

<u>Miranda</u> rights at 2:35 a.m. (Docket Entry No. 43-5 at 22-24).[3] Defense cross-examination at

the suppression hearing suggested that at 2:35 a.m. Petitioner may have been asleep. <u>Id.</u> at 22.

On cross-examination at the suppression hearing, Barnett described his practice to ask a person in

custody if he or she wanted to give a statement, <u>id.</u> at 23, but that question is asked after he first

reads the suspect his <u>Miranda</u> rights and the suspect has signed the <u>Miranda</u> waiver.

> Q.    Would you please describe to the Court, how did you go over the Waiver
>       of Rights? In other words, did you read it to him, did you show it to him?
>       If you could go through that for the Court, please.
>
> A.    Yes. <u>I filled out the top, his name, the date and the time. And then I read
>       him the top paragraph verbatim. And after I read the top paragraph I then
>       ask him if he understands his rights, wait for a response, a yes or a no. If
>       they say no I ask them what that didn't understand, and so forth.</u>
>
>       <u>In this case he stated he did understand his rights. So at that point
>       in time I then signed the form, acknowledging that I had read him
>       his rights and that he had understood his rights.</u>
>
>       <u>I then passed the sheet to him. You know, if he can read and write -
>       - if the person can read and writ I pass the sheet to them. And in
>       Mr. Johnson's case he indicated he could read. I had him read the
>       second paragraph, which is the waiver, back to me, verbally and
>       out loud where I can understand it and ensure that he understood
>       what he was reading. And then I had him sign the form if he
>       understands it and wishes to give a statement at that time.</u>
>
> Q.    And did you actually witness him sign the form?
>
> A.    Yes. I did.
>
> Q.    That was after he read it out loud, his Waiver of Rights back to you?
>
> A.    That's correct.

(Docket Entry No. 43-5, Transcript of Suppression Hearing at 5-6).

---

[3]The reference as to the page numbering is on the Court's electronic filing of this
transcript for the Docket Entry.

Case 3:06-cv-00416   Document 65   Filed 03/26/10   Page 20 of 32 PageID #: 722

Here, the Tennessee appellate court relied upon evidence that Detectives Barnett read Petitioner his <u>Miranda</u> rights and also had Petitioner read his <u>Miranda</u> rights to Barnett before Petitioner signed his <u>Miranda</u> waiver and gave his statements. Thus, Petitioner's distinction about a "question-first" interrogation before <u>Miranda</u> warnings, based upon <u>Missouri v. Seibert</u>, 542 U.S. 600, 612 (2004), is not warranted here. The state record establishes that before the pre-interview, Petitioner was given his <u>Miranda</u> hearing and signed a <u>Miranda</u> waiver. The Court concludes that the state courts' findings on these <u>Miranda</u> claims are reasonable.

In the interview room, Barnett and Petitioner again reviewed the <u>Miranda</u> warnings and Petitioner read his <u>Miranda</u> rights before he gave his incriminating statements. During the interview, Barnett described Petitioner as coherent. The state courts also credited the testimony of Barnett who denied making any threats about a 21 year sentence if Petitioner confessed. In a videotape, Petitioner illustrated how he killed the victim. In this video, Petitioner was observed as "calm and extremely articulate in describing why and how he killed the victim." <u>Johnson</u>, 2003 WL 358251 at *9. Petitioner's demeanor in the video-taped interview was found inconsistent with any coercive police conduct. <u>Id.</u> Similarly, in his Nashville interview, Dunaway also considered Petitioner to be completely normal. The state courts concluded that Petitioner never proved "that the police coerced his confession. <u>Id.</u>

Under <u>Skaggs</u>, the state trial court's and appellate court's findings on credibility are entitled to presumption of correctness. 235 F.3d at 266. In these circumstances, the Court concludes that the state courts could reasonably conclude that Petitioner received his <u>Miranda</u> warnings and his statements to the police were voluntarily and knowingly given.

### 2. Sufficiency of the Evidence

21

On this claim, the Tennessee Court of Criminal Appeals, citing federal law, found the

State's proof sufficient to support Petitioner's convictions:

> The defendant claims that the evidence is insufficient to support his first degree premeditated murder conviction because it shows that he snapped and that he did not plan to kill the victim. In addition, he contends that the evidence is insufficient to support his theft conviction because the state failed to prove that the victim's car had a value of more than five hundred dollars. The state argues that the evidence is sufficient. We agree with the state.
>
> Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn.1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997) First degree premeditated murder is defined as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Further, "premeditation" is defined as:
>
>> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.
>
> Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has delineated the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id. A conviction for first degree premeditated murder requires proof that the defendant unlawfully and knowingly killed another.

See Tenn. Code Ann. §§ 39-13-201, -210(a)(1). First degree felony murder is in pertinent part, a "killing of another committed in the perpetration of or attempt to perpetrate any ... theft." Tenn. Code Ann. § 39-13-202(a)(2).

Viewed in the light most favorable to the state, the evidence shows that the defendant is guilty of first degree premeditated murder. Our review of the defendant's videotaped and audiotaped confessions reveals that on the night the defendant killed the victim, the victim went to bed and the defendant went into a second bedroom to watch television. While watching television, the defendant decided to kill the victim and pawn the victim's property. The defendant told David Lackey that he was going to kill the victim. Mr. Lackey or the defendant got a sledgehammer out of the victim's garage, and the defendant carried the sledgehammer into the victim's bedroom. While the victim was sleeping and defenseless, the defendant hit the victim in the head three times with the sledgehammer and covered the victim with a blanket. This evidence is sufficient to support the victim's conviction for premeditated murder. Moreover, although not contested by the defendant, we believe the evidence also is sufficient to support the defendant's felony murder conviction because the evidence shows that after the defendant killed the victim, he and Mr. Lackey loaded the victim's personal property into the victim's car and fled the scene.

As for his theft of property conviction, the only evidence presented regarding the Marquis' value occurred during the state's questioning of Tom Hailey. Mr. Hailey testified as follows:

> Q. Did you have, by any chance, any knowledge of his 1985 Mercury Marquis car?
>
> A. Yes, ma'am. He had two cars.
>
> Q. Okay. And who had the title on the 1985 Mercury Marquis, the dark car?
>
> A. I did.
>
> Q. And why did you have the title on that car?
>
> A. Because I had just gotten it out of the shop. He had just gotten it out of the shop. He hadn't got paid, and he insisted that I take the title.
>
> Q. Did you loan him money in exchange for that?

23

A. Yes, ma'am.

Q. And how much, if you were to place a dollar figure or value on that car, would you place?

A. I don't have the slightest idea. I would say five hundred dollars.

Q. Okay. And how much was the loan that you gave to Mr. Wiggins for the repairs?

A. Four something, four-low figures.

Q. Four hundred?

A. Yes, ma'am.

Later, Detective Larry Carter testified that he inventoried eighteen items found in the car, including several televisions and VCRs. A list of the inventoried items, which the state introduced into evidence, shows that the car also contained several bottles of liquor, two quartz wall clocks, a pocket radio, and a stereo receiver. Moreover, we note that Detective Carter wrote on the list that the estimated value of the property was five thousand dollars. While we believe the prosecution put forth minimal effort to prove the value of the car or the stolen items, we conclude that, viewed in the light most favorable to the state, a rational jury could have found that the victim's car and electronic equipment had a value of more than five hundred dollars. The evidence is sufficient to support the defendant's theft conviction.

State v. Johnson, 2003 WL 358251 at **5-7 (Docket Entry No. 7-1).

For a Fourteenth Amendment claim based upon insufficient evidence, in Jackson v.

Virginia, 443 U.S. 307 (1979), the Supreme Court set forth the standard for reviewing the legal

sufficiency of the evidence in support of a conviction.

...[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to `ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution,

24

any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

443 U.S. at 318-19 (emphasis added with footnotes and citations omitted).

A presumption of correctness obtains in determining whether there exists sufficient evidence to support a conviction. 28 U.S.C. § 2254(b). Circumstantial evidence, if sufficient to establish an element of the offense, satisfies constitutional requirement of due process, Wiley v. Sowders, 669 F.2d 386, 390 (6th Cir. 1982) (per curiam) and such evidence need not remove every reasonable hypothesis except that of guilt. Tilley v. McMackin, 989 F.2d 222, 225 (6th Cir. 1993). Uncorroborated accomplice testimony is sufficient to support a conviction under the United States Constitution. This due process guarantee of sufficiency of the evidence extends only to the elements of the crime, not to the state's burden to prove the absence of an affirmative defense, unless the state has made the absence of a defense an element of the crime. Allen v. Redman, 858 F.2d 1194, 1196-98 (6th Cir. 1988). At that point, sufficiency of evidence on the issue will be relevant. Id. at 1197-98.

Hearsay evidence can be used to support a state conviction provided it qualifies as an exception to the hearsay rule. White v. Illinois, 502 U.S. 346, 355-57, 356 n. 8 (1992). The standard is whether the hearsay evidence carries sufficient guarantees of trustworthiness. Curro v. United States, 4 F.3d 436, 437 (6th Cir. 1993). It is unnecessary to establish the unavailability

25

of the declarant if the hearsay statements were made in a prior court proceeding. United States v. Inadi, 475 U.S. 387, 394 (1986). Inadmissible hearsay testimony, however, of a non-testifying codefendant that clearly implicates the defendant cannot be admitted against the defendant as this would violate his right to confront his witnesses. Richardson v. Marsh, 481 U.S. 200 (1987)

A question of purely state law rarely serves as a basis for habeas corpus relief. Estelle v. McGuire, 502 U.S. 62 (1991). "Today, we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions." Id. at 67-68. Rulings by a state's highest court on state law issues are binding on the federal courts. Wainwright v. Goode, 464 U.S. 78, 84 (1983) (per curiam). The Court is bound by decisions of an intermediate state appellate court unless the district court is convinced that the highest state court would decide the issue differently. Olsen v. McFaul, 843 F.2d 929 (6th Cir. 1988). An issue concerning admissibility of evidence does not arise to a level of constitutional magnitude unless it can be viewed as so egregious that petitioner was denied a fundamentally fair trial. Cooper v. Sowders, 837 F.2d 284, 286 (6th Cir. 1988). To warrant habeas relief, the excluded evidence must be critical and "tend to exculpate" the petitioner and also must contain "persuasive assurances of trustworthiness." Turpin v. Kassulke, 26 F.3d 1392, 1396 (6th Cir. 1994).

Here, Petitioner's statement prior to the murder that he would kill the victim and take his property, the manner of the victim's death by a sledgehammer blow to his head, Petitioner's subsequent taking of the victim's property, Petitioner's admissions that he killed the victim and the Petitioner's fingerprints on the door in the victim's bathroom, entertainment center and living room as well as his subsequent conduct, provide ample proof to support the Petitioner's convictions. This claim is without merit.

26

### 3. Petitioner's Defaulted Claims

It is undisputed that the Petitioner's claims of ineffective assistance of counsel and his incompetence to stand trial were not present to any state trial court and that his prosecutorial misconduct claim was not raised as a federal law claim in the state courts. As to the prosecutorial misconduct claims, Petitioner never cited any federal law for this claim, only state law. (Docket Entry No. 43-7, Petitioner Brief at 4, 13-15). Thus, Respondent contends these claims are procedurally defaulted.

The Tennessee Court of Criminal Appeals addressed this prosecutorial misconduct claim based upon improper closing argument remarks on direct appeal:

> Finally, the defendant claims that the trial court erred by failing to order the prosecutor to stop misstating the facts during her closing argument. In addition, he contends that the trial court should have provided the jury with a curative instruction regarding the misstatements. The state argues that the prosecutor's statements were not improper, and, therefore, that no curative instruction was required. We believe that the defendant is not entitled to relief.
> During the state's closing argument, the prosecutor said, "Billy Wiggins was a person. He got a paycheck. He was a single gay dude. He was an 'it'. He was a faggot, who you couldn't stand to look at." Later, the prosecutor stated the following:
>
> > So [the defendant] sits in his room, watching TV, decides to kill [the victim]. He's going to haul his TVs and his VCRs and load them up and take off.
> >
> > So what does he do? He gets up. He walks out of the room. He walks down the hall. He walks into the living room, where David is. He stops, he has a conversation. He has a conversation with David about what he is planning to do.
> >
> > He asks him, "Are you in on it? Are you game for it?" See, he needs David because David's the one with the I.D.
>
> At that point, the defense objected on the basis that there was no evidence that the defendant made those statements to David Lackey. The trial court overruled the

27

objection and said, "It's for the Jury to decide what the facts are in the case."

The defendant first contends that the prosecutor referred to the victim as an "it" and a "faggot" in order to inflame the jury and give the jury the impression that the defendant killed the victim because the victim was a homosexual. As for the prosecutor's statements regarding the defendant's conversation with Mr. Lackey, the defendant claims that there was no evidence that he made those statements. Moreover, he contends that he was prejudiced by the statements because they gave the jury the impression that he planned and premeditated the killing.

Regarding the prosecutor's referring to the victim as an "it" and a "faggot," as the state points out in its brief, the defendant failed to object at trial to the prosecutor's statements. The failure to object contemporaneously constitutes a waiver of the issue pursuant to Rule 36(a), T.R.A.P. See also State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (failure to object to prosecutor's alleged misconduct during closing argument waives any later complaint). With respect to the prosecutor's statements about the defendant's conversation with David Lackey, the defendant confessed to police that he decided to kill the victim and that he told Mr. Lackey about his intentions. However, the record contains no evidence that the defendant specifically said, "Are you in on it? Are you game for it?" Nevertheless, we believe that in making those statements to the jury, the state merely was trying to show that the defendant premeditated the killing and that Mr. Lackey agreed to go along with it. There is no evidence that the prosecutor deliberately tried to mislead the jury, and there is ample evidence to support the jury's finding of premeditation. We conclude that the prosecutor's statements did not prejudice the defendant.

State v. Johnson, 2003 WL 358251 at **10-11 (Docket Entry No. 7-1).

In United States v. Young, 470 U.S. 1, 13 n. 10 (1985), notwithstanding improper remarks by the prosecutor, the Supreme Court upheld the conviction and observed that even if "the prosecutor's remarks exceeded permissible bounds and defense counsel raised a timely objection, a reviewing court could reverse an otherwise proper conviction only after concluding that the error was not harmless." (citation omitted). The Court also stated:

Nevertheless, a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.

28

\* \* \*

> [T]he remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant. . . . Courts of Appeals, applying these holdings, have refused to reverse convictions where prosecutors have responded reasonably in closing argument to defense counsel's attacks, thus rendering it unlikely that the jury was led astray.

Id. at 11, 12. Given the State's proof, the Court concludes that the cited prosecutor's argument would not excuse Petitioner's procedural default.

As to his other justification for his procedural defaults, Petitioner contends that the State process did not provide expert assistance in non-capital cases and thus the State caused his procedural defaults on his claim of mental incompetence and his related claim of ineffective assistance of counsel for failure to prove Petitioner's limited mental abilities. The Court notes that at the time of Petitioner's trial in 1999, state law actually provided expert assistance.

> [F]ollowing Ake and prior to the petitioner's trial, this court noted in State v. Phillips, 728 S.W.2d 21, 24-25 (Tenn. Crim. App. 1986), a non-capital case, that a threshold showing of a denial of due process of law might entitle the defendant to the appointment of an expert at the State's expense. In State v. Hannah, No. 224, 1989 WL 16677, at ----1-2 (Tenn. Crim. App. at Knoxville, February 28, 1989), an unpublished case, this court acknowledged an indigent defendant's right in a non-capital case to expert assistance, if a denial of assistance would result in a constitutional deprivation under the doctrines of due process and equal protection.

> . . . in 1995, in State v. Barnett, 909 S.W.2d 423, 427 (Tenn.1995), did our supreme court determine that the principles set forth in Ake were equally applicable in non-capital cases. Significantly for the purposes of this case, the court noted that it had never previously considered this issue and that the court of criminal appeals had also never been required to definitively reach this issue. Id. . . . . . This court further clarified that, while Barnett, like Ake, dealt with a psychiatric expert, the new constitutional protections announced in Barnett applied to other forms of expert assistance, including a DNA expert. Jacobs, No. 01C01-9601-CC-00048, 1997 WL 576493, at *2.

29

Steele v. State, 1999 WL 512053 at *12. Thus, the Court concludes state law did not preclude pursuit of these defaulted claims.

As to his incompetency claim, Petitioner cites a notation in an initial assessment for his thirty-two days hospitalization, in which a physician wrote that "I wonder a little about this gentleman being a little psychotic." (Docket Entry No. 47-1 at 4). Petitioner was admitted to psychiatry, but the discharge diagnoses were:

DISCHARGE DIAGNOSIS: 1. Cephalgia or pressure in the head, not necessarily a headache.
2. Polysubstance abuse.
3. Upper respiratory infection, mild.

Id. at 6. In a word, the entire record for that hospitalization and treatment did not disclose any significant mental impairment.

Prior to the trial, the Vanderbilt Forensic Psychiatry Clinic conducted a competency and sanity evaluation that did not reveal Petitioner as having any mental illnesses or substantial mental impairments at the time of the murder.

After completion of the competency evaluation by A. Sparks, M.D., we have concluded that the defendant's condition is such that he is capable of defending himself in a court of law. In making this determination, we found that the defendant understands the nature of the legal process; that he understands the charges pending against him and the consequences that can follow; and can advise counsel and participate in his own defense.

Upon completion of the mental condition evaluation pursuant to T.C.A. 33-7-301(a) and the standard effective with the change to T.C.A. 39-11-501 on July 1, 1995 (Public Chapter 494), it is our opinion that at the time of the alleged offenses, the defendant was not exhibiting a mental illness or defect which would result in substantial impairment of his capacity to appreciate the wrongfulness of the alleged offenses.

(Docket Entry No. 47-2 at 2).

30

The evidence at the hearing in this action established that the Vanderbilt Psychiatric Clinic had information that the Petitioner had been prescribed Loxitane at the jail at the time of its evaluation of Petitioner's competency and his lack of any mental impairment at the time of the murder. Except for the jail records, the Vanderbilt Clinic acquired the medical records of Petitioner's other medical treatment, but did not deem an additional evaluation necessary. Those additional records did not reflect any diagnosis that Petitioner had any psychotic or other mental condition as reflected by their discharges of the Petitioner. As to Petitioner's statement at one time that he would not assist his counsel, Petitioner did not testify as to what if any factual assistance Petitioner could have provided nor has Petitioner cited any other facts that counsel could have discovered.

Moreover, the specifics of the murder prove a deliberate and planned act first to decide to kill the victim, second to secure the sledge hammer from the victim's garage area, third to kill the victim, fourth to rob the victim of several items and have his co-defendant pawn them, and fifth to drive off in the victim's vehicle. In his confession, Petitioner stated that he had been drinking and had taken some pills, but Petitioner was able to describe in detail the specifics of his plan to murder, the specific manner in which he repeatedly struck the victim, the inside design of the victim's home and his specific activities before and after the murder. The Court concludes that the state record did not support any diminished capacity defense as the dominant diagnosis of Petitioner was polysubstance abuse and the facts do not show the Petitioner impaired at the time of the murder, despite his prior use of alcohol and pills. See State v. Smith, 999 S.W.2d 6, 18 (1999) ("Though the defendant stated that he had been drinking alcohol and smoking marijuana prior to the crime [first degree murder], there is no evidence to show that his judgment

31

or abilities were impaired.").

Accordingly, the Court concludes that Petitioner has not established any omission of trial counsel that prejudiced the Petitioner. See Coleman v. Thompson, 501 U.S. 722, 753-54 (1992). Thus, Petitioner's incompetency and related ineffective assistance of counsel claims are not grounds to excuse his procedural defaults.

For these reasons, the Court concludes that the Respondent's motion to dismiss should be granted and the petition for the writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the ___26___ day of March, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge